IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PUBLIC CITIZEN
1600 20th Street, NW
Washington, D.C. 20009

CRAIG HOLMAN
309 Maryland Avenue, NE #3
Washington, D.C. 20002

Civil Action No: _____

PROTECTOURELECTIONS.ORG
POB 9576
Washington, DC 20016

KEVIN ZEESE
402 E. Lake Ave.
Baltimore, MD 21212

Plaintiffs,

v.

FEDERAL ELECTION COMMISSION
999 E Street N.W.
Washington, D.C. 20436

Defendant.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs bring this action for declaratory and injunctive relief against the Federal

Election Commission ( "FEC" or "Commission") for its dismissal of their administrative

complaint against Crossroads Grassroots Political Strategies ("Crossroads GPS").  *See* 2 U.S.C. §

437g(a)(8)(A).

2.      On October 14, 2010, Plaintiffs filed a complaint with the Commission alleging

that Crossroads GPS had violated various provisions of the Federal Election Campaign Act of

1971 ("FECA" or "the Act"), as amended, 2 U.S.C. §§ 431 *et seq.*, by spending millions of

dollars on advertising to influence federal elections while failing to register with the Commission

as a "political committee" and comply with attendant campaign finance disclosure requirements.

These violations resulted in non-disclosure to the public and plaintiffs of the sources of funding

for Crossroads GPS's political advertising in federal elections.  *See* 2 U.S.C. §§ 432, 433, 434.

3.       The Supreme Court has repeatedly recognized that disclosure laws play a vital

role in our democracy by providing voters with important information about who is funding

political advertising during elections, so that voters can evaluate different speakers and

messages, make informed voting choices and hold elected officials accountable.  Effective

enforcement of FECA disclosure requirements is essential to the health of our democracy.

4.       On December 3, 2013, the FEC's six Commissioners voted 3-3 on whether there

was "reason to believe" that Crossroads GPS had violated FECA.  Without the affirmative votes

of at least four Commissioners needed to proceed with an investigation into the alleged

violations, the Commission then dismissed the complaint.

5.       The three Commissioners who voted to find no "reason to believe"—effectively

blocking investigation and forcing the dismissal of Plaintiffs' administrative complaint—relied

on two erroneous propositions of law: (1) that only express advocacy could be considered in

determining whether an entity had the "major purpose" of influencing elections required to make

it a political committee under FECA, and (2) that the organization's own fiscal year, rather than

the electoral cycle, formed the only proper time frame for considering whether the organization

was a political committee.

6.       The FEC's dismissal of Plaintiffs' administrative complaint and its failure to

investigate Crossroads GPS was arbitrary, capricious, an abuse of discretion, and otherwise

contrary to the law.  *See Orloski v. FEC*, 795 F.2d 156, 161 (1986).  The FEC's dismissal of

Plaintiffs' complaint has undermined FECA's purposes, including its goal of promoting

transparency in elections and providing the electorate with information about who is speaking to

it during elections.  Plaintiffs have suffered as a result, because they, as well as the public, have

been deprived of information about the sources, amounts, and beneficiaries of Crossroads GPS's

expenditures—information to which they are legally entitled under FECA.

7.     Accordingly, Plaintiffs seek a judicial declaration that the FEC's failure to

investigate Crossroads GPS and its dismissal of Plaintiffs' administrative complaint was

arbitrary, capricious, an abuse of discretion, and otherwise contrary to the law.  Plaintiffs further

seek an order requiring the FEC to conform with such a declaration within 30 days.  *See* 2 U.S.C.

§ 437g(a)(8)(C).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction under 2 U.S.C. § 437g(a)(8)(A) and 28 U.S.C. § 1331.

9.     Venue in this district is proper pursuant to 2 U.S.C. § 437g(a)(8)(A) and 28

U.S.C. § 1391(e).

## PARTIES

10.     Plaintiff Public Citizen, Inc., is a nonpartisan, nonprofit membership organization.

Public Citizen works on a variety of issues on behalf of consumers and the public, including

consumer product safety and consumer financial protection.  One of Public Citizen's primary

missions is also to combat corruption in the political system through election reform.  In

connection with these goals, Public Citizen studies and reports on the role of money in elections

and the influence of political spending on officeholders and public policy.  Public Citizen has

members nationwide who are voters, and many of those members reside in states and electoral

districts where Crossroads GPS has engaged in spending to affect federal elections.  As voters,

those members are entitled to receive the information that FECA requires political committees and others to disclose to the public, and their informed exercise of the vote is impaired when such information is unavailable.  Public Citizen brings this case on its own behalf and on behalf of its members.

11.     Plaintiff ProtectOurElections.org is a national collaboration of grassroots organizations that work together to provide oversight of elections and to advocate for campaign finance reform.  They rely on political committees' public disclosure reports to evaluate the influence of money in politics.

12.     Plaintiff Craig Holman is employed by Public Citizen as its Legislative Representative specializing in campaign finance and government ethics issues.  He has a Ph.D. in Political Science from the University of Southern California and has studied the impact of money on politics for many years, both before and after joining Public Citizen.  Dr. Holman's duties, as well as his independent research interests, involve the study of contributions to and expenditures by political organizations of various types, including political committees that report contributions and expenditures to the FEC.  Dr. Holman relies on disclosure information to advocate for new policies and to evaluate the interests to which lawmakers may be beholden. He is also a citizen of the United States and a registered voter in the District of Columbia.  As a registered voter, Dr. Holman is entitled to receive the information that FECA requires political committees and others to disclose to the public, and his informed exercise of the vote is impaired when such information is unavailable.

13.     Plaintiff Kevin Zeese, Esq., is an attorney with ProtectOurElections.org and is committed to reforming politics and elections.  He relies on information about campaign-related spending to evaluate different speakers and messages and to monitor the impact of large

expenditures on officeholders and public policy.  He is also a United States citizen and a

registered voter in Maryland.  As a registered voter, Mr. Zeese is entitled to receive the

information that FECA requires political committees and others to disclose to the public, and his

informed exercise of the vote is impaired when such information is unavailable.

14.     Defendant FEC is an independent federal agency charged with the administration

and civil enforcement of FECA.  2 U.S.C. § 437c(b).

## FACTS

### Crossroads GPS

15.     Crossroads GPS is a nonprofit organization founded on June 1, 2010.  It was

conceived of by prominent Republican strategists Karl Rove and Ed Gillespie, and is closely

associated with American Crossroads, a Section 527 political organization and FEC-registered

independent expenditure-only political committee (a.k.a. "super PAC").  American Crossroads

was established shortly before Crossroads GPS in March 2010 and the two organizations share

offices and personnel.

16.     Since its inception, Crossroads GPS has claimed Section 501(c)(4) tax-exempt

status and, in September 2010, Crossroads GPS applied to the Internal Revenue Service for

Section 501(c)(4) status.  Section 501(c)(4) of the Internal Revenue Code exempts from federal

income tax organizations that are exclusively engaged in promotion of social welfare, which

under IRS regulations does not include electoral activity.  Many public interest groups have

challenged the legitimacy of Crossroads GPS's self-claimed 501(c)(4) status.  The Internal

Revenue Service ("IRS") has apparently not yet made a determination regarding Crossroads

GPS's application.

17.     According to press report published shortly after Crossroads GPS was formed: "A new political operation conceived by Republican operatives Karl Rove and Ed Gillespie formed a spinoff group last month [Crossroads GPS] that—thanks in part to its ability to promise donors anonymity—has brought in more money in its first month than the parent organization [American Crossroads] has raised since it started in March."  Kenneth P. Vogel, *Rove-linked group uses secret donors to fund attacks*, POLITICO (July 21, 2010, 7:35 PM), http://www.politico.com/news/stories/0710/39998.html.  The same article reported that "a veteran GOP operative familiar with the group's fundraising activities said the spin-off was formed largely because donors were reluctant to see their names publicly associated with giving to a 527 group[,]" American Crossroads.  *Id.*

18.     Crossroads GPS is widely recognized as one of the most powerful political spending groups in the country, having spent tens of millions of dollars to influence federal elections since 2010, more than any other purported 501(c)(4) organization, and more than all but a handful of super PACs.

19.     In 2010, Crossroads GPS spent millions of dollars on federal campaign activity. The FEC's Office of General Counsel found that the organization had spent at least $20.8 million on federal campaign activity (including independent expenditures and electioneering communications as defined by FECA as well as communications that promote, attack, support, or oppose federal candidates) between June and December 2010—more than half of the $39.1 million Crossroads GPS reported to the IRS that it spent in 2010.

20.     More recently, in the 2012 election cycle, Crossroads GPS reportedly spent at least $71 million on federal campaign activity.

21.     Crossroads GPS is also widely recognized as one of the largest spenders of "dark money"—*i.e.*, money from undisclosed sources—in federal elections.  Groups organized under Section 501(c)(4), as Crossroads GPS purports to be, are not required by tax law to publicly disclose the sources of their funds.  Additionally, because Crossroads GPS contends that it is not a political committee under FECA, it has not complied with the FECA provisions requiring political committees to file reports with the FEC disclosing the sources of their funds, *see* 2 U.S.C. § 434.  Consequently, Plaintiffs and the public have been unable to obtain information about the sources and amounts of the huge sums of money raised and spent by Crossroads GPS to influence recent federal elections.

### Statutory and Regulatory Framework

22.     FECA imposes registration, organization, and disclosure requirements on political committees.

23.     FECA defines "political committee" to mean "any committee, club, association or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year."  2 U.S.C. § 431(4); *see also* 11 C.F.R. § 100.5(a).  A "contribution" is defined as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office."  2 U.S.C. § 431(8)(A).  An "expenditure" is defined as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office."  2 U.S.C. § 431(9)(A).

24.     In *Buckley v. Valeo*, 424 U.S. 1, 79 (1976), to avoid the statute reaching groups "engaged purely in issue discussion," the Supreme Court construed the term "political

committee" to "only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." The Court has subsequently affirmed *Buckley*'s "major purpose" test. *See*, *e.g.*, *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 252-53 n.6 (1986); *McConnell v. FEC*, 540 U.S. 93, 170 n.64 (2003).

25.     Thus, there is a two-prong test for political committee status under FECA. The first prong asks whether an entity or other group of persons has made more than $1,000 in "expenditures" or received more than $1,000 in "contributions" during a calendar year. 2 U.S.C. § 431(4)(A). The second prong asks whether the organization has as its "major purpose . . . the nomination or election of a candidate." *Buckley*, 424 U.S. at 79.

26.     The FEC makes "major purpose" determinations on a case-by-case basis—an approach that has consistently been upheld against legal challenge. *See Free Speech v. FEC*, 720 F.3d 788, 798 (10th Cir. 2013), *petition for cert. filed*, No. 13-772 (Dec. 30, 2013); *Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 556 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 841 (2013); *Shays v. FEC*, 511 F. Supp. 2d 19, 29-31 (D.D.C. 2007).

27.     In 2007, the FEC provided additional guidance to organizations about the factors used to determine an organization's major purpose. *See* FEC, Political Committee Status, 72 Fed. Reg. 5595, 5596-7 (Feb. 7, 2007) (Supplemental Explanation and Justification) ("2007 SE&J"). The Commission explained that it considers indicia such as: public and non-public statements about the organization's purposes and activities; public and non-public fundraising appeals; and the proportion of spending related to "federal campaign activity" compared to the proportion spent on "activities that [a]re not campaign related." 72 Fed. Reg. at 5601, 5604-5.

**Plaintiffs' Administrative Complaint**

28.     On October 14, 2010, Plaintiffs filed a sworn administrative complaint with the FEC, pursuant to 2 U.S.C. § 437g(a) and all applicable FEC regulations, alleging that Crossroads GPS violated various provisions of FECA.  The FEC designated the administrative complaint Matter Under Review ("MUR") 6396.

29.     Plaintiffs' administrative complaint alleged that Crossroads GPS is a political committee because, in 2010, it exceeded the Act's $1,000 expenditure threshold and its major purpose was to influence federal elections.  The complaint further alleged that Crossroads GPS violated the requirements governing political committees—most notably, the Act's registration and disclosure requirements.

30.     Plaintiffs explained in their complaint that "[t]he deployment of section 501(c)(4) organizations in 2010 as a vehicle for undisclosed money to pay for partisan activities to influence federal elections [was] simply the latest chapter in the long history of efforts to evade and violate federal campaign finance laws."  Pls.' FEC Compl. ¶ 5.

31.     In support of their complaint, Plaintiffs alleged, among other things, that:

(a)     Crossroads GPS and American Crossroads were both conceived of by veteran Republican strategists Karl Rove and Ed Gillespie, and the two organizations largely operated together.  *Id.* ¶¶ 25, 26, 31, 32, 34.

(b)     Karl Rove provided advice and fundraising support to both Crossroads GPS and American Crossroads.  *Id.* ¶ 26.

(c)     Crossroads GPS and American Crossroads were avenues for Republican donors to support Republican candidates.  For instance, Karl Rove explained on Fox News that American Crossroads and Crossroads GPS were simply avenues for donors who had "maxed out" to federal

Republican political committees to funnel money into the 2010 elections.  Rove elaborated: "What we've essentially said is, if you've maxed out to the senatorial committee, the congressional committee or the RNC and would like to do more, under the *Citizens United* decisions, you can give money to the American Crossroads 527 or Crossroads GPS." *Id.* ¶ 32.

(d)     One purpose of Crossroads GPS is to conceal the identities of donors.  *Id.* ¶ 5. For instance, the organization assures its donors that, while it must disclose donors over $5,000 to the IRS, the IRS does not make this information public and it is Crossroads GPS's policy not to make that information public.  *Id.* ¶ 27.

(e)     On October 5, 2010, Crossroads GPS and American Crossroads announced a $4.2 million ad buy, targeting eight hotly contested Senate races.  Seventy-five percent of the ad buy was paid for with funds from undisclosed donors.  *Id.* ¶ 34.

(f)     By October 5, 2010—just four months after Crossroads GPS's inception— Crossroads GPS and American Crossroads had already spent $18 million on the 2010 campaigns. *Id.* ¶ 26.

(g)     Crossroads GPS "micro-targeted" its efforts on seven states with hotly contested Senate races in 2010.  *Id.* ¶ 33.

(h)     The Chairman of the board of American Crossroads, Mike Duncan, had told *The Washington Times* that American Crossroads and Crossroads GPS planned to raise more than $52 million and "plan[ned] to plow more than $49 million of it into 11 Senate races in anticipation that the Republican Party is within reach of a Senate majority."  *Id.* ¶ 31 (quoting R. Hallow, *Pro-GOP Nonprofits Kick in Millions; Cash to Target 11 Senate Races*, WASH. TIMES, Aug. 19, 2010).

(i)      Between September 20, 2010 and the filing of the administrative complaint in early October 2010, Crossroads GPS had already reported more than $2.5 million in express advocacy expenditures.  These expenditures clearly established that the organization had surpassed the $1,000 expenditure threshold for political committee status and were so extensive as to establish the organization's major purpose as influencing the 2010 federal elections.  *Id.* ¶ 36.

(j)      Crossroads GPS had produced and disseminated numerous ads for the purposes of influencing the elections.  For instance, twenty-two of these ads, which were posted on the organization's YouTube channel, clearly sought to influence the 2010 congressional elections. *Id.* ¶ 37.  The scripts for several of these ads were included in Plaintiffs' administrative complaint filed with the FEC.  *Id.* ¶¶ 38-46.

## The FEC General Counsel's Report

32.      On November 21, 2012, the FEC's Office of the General Counsel ("OGC") submitted to the Commission its First General Counsel's Report ("the Report") recommending that the Commission find reason to believe Crossroads GPS had violated FECA and recommending that the Commission launch an investigation into the matter.  FEC, *In Re Crossroads Grassroots Policy Strategies* (MUR 6396), First General Counsel's Report, Nov. 21, 2012.

33.      The Report stated that Crossroads GPS conceded in its response to Plaintiffs' administrative complaint that it exceeded the Act's $1,000 threshold for expenditures or contributions triggering political committee status under 2 U.S.C. § 431(4).  Thus, the issue was whether Crossroads GPS had the major purpose of influencing federal elections in 2010.  *Id.* at 3.

34.     The OGC found Crossroads GPS's arguments that it did not meet the major

purpose test "wide of the mark."  Instead, "the available information regarding Crossroad GPS's

overall conduct in 2010 support[ed] a finding that there [was] reason to believe that Crossroads

GPS had as its major purpose the nomination or election of federal candidates."  *Id.* at 3.

35.     The Report noted the close relationship between Crossroads GPS and American

Crossroads, including that the organizations operate from the same address and share at least

four corporate officers and employees in common.  *Id.* at 5.  The joint communications director

for both organizations had also reportedly stated that the two organizations raised funds jointly

and "the fact that [the organizations were] raising [money] for two groups instead of one [was] a

distinction without a difference."  *Id.* at 5-6.

36.     According to the Report, the shared President of both organizations, Steven Law,

claimed that the reason for creating two organizations was the different focus of each.  Law,

however, had also acknowledged that anonymity for donors to the 501(c)(4) was a valuable

fundraising tool.  *Id.* at 6.

37.     The Report explained that, although Crossroads GPS stated in its response, on its

website, and in its tax returns that its major purpose was not federal campaign activity, these

statements are not dispositive to the Commission's inquiry.  *Id.* at 16.  Instead, under the

Commission's case-by-case approach, the Commission considers the "overall conduct" of an

organization, including its spending, activities, and statements.  *Id.* at 16.  The Report found that

"Crossroads GPS's proportion of spending related to federal campaign activity is *alone* sufficient

to establish that its major purpose in 2010 was the nomination or election of federal candidates."

*Id.* at 17 (emphasis added).

38.     Crossroads GPS, in its response to Plaintiffs' administrative complaint, reported that it had spent $15.4 million in independent expenditures in 2010—$13,259,915.13 on seven Senate races and $2,185,124.37 on eight House races.  *Id.* at 7.

39.     In addition to this $15.4 million in reported independent expenditures, "the available information indicate[d] that Crossroads GPS spent approximately $5.4 million in 2010 on communications that d[id] not contain express advocacy but criticize[d] or oppose[d] a clearly identified federal candidate."  *Id.* at 17.  The Report included the scripts of ten such ads.  *Id.* at 19-22.  The Commission had previously relied on this type of spending to establish organizations' major purposes.  *Id.*

40.     The Report dismissed Crossroads GPS's claim that the $5.4 million spent on non-express advocacy ads should be disregarded in the major purpose determination.  The Report explained: "that argument fail[ed] to come to terms with the Commission's longstanding view— upheld by the courts—that the required major purpose test is not limited solely to express advocacy (or the functional equivalent of express advocacy)."  *Id.* at 22.  Rather, because "[e]ach of the Crossroads GPS ads feature[d] a clearly identified federal candidate, criticize[d] or oppose[d] a candidate, and was run in the candidate's respective state shortly before the 2010 elections," "[t]he fact that the ads [did] not contain express advocacy, or the functional equivalent, [did] not shield such ads from consideration under the major purpose test."  *Id.*

41.     The OGC also rejected Crossroads GPS's argument that, as a self-designated 501(c)(4) organization, it should not be found to satisfy the major purpose test.  The Report explained that the Commission had already concluded, in its 2007 SE&J, that an organization's tax status should not be used as a substitute for the conduct-based determination required to assess political committee status.  *Id.* at 24 (discussing the 2007 SE&J).  And, in any event, the

OGC found the argument premature as to Crossroads GPS since the IRS had not approved its application for 501(c)(4) status.  *Id.*

      42.     Finally, the OGC rejected Crossroads GPS's argument that its activities should be evaluated according to its own self-selected fiscal year, instead of a calendar year.  The Report explained that evaluating organizations according to a calendar year, rather than a self-selected fiscal year, is consistent with FECA's plain language defining "political committee"; that allowing organizations to select their fiscal year for evaluation would lead to absurd results; and that evaluations based on the calendar year were consistent with the Commission's past practices.  *Id.* at 25.  And, in any event, the OGC recommendation would not change if it considered Crossroads GPS's 2011 spending.  *Id.* at 26.

      43.     The Report therefore concluded that, "taking into account all of its spending in 2010, Crossroads GPS appears to have spent approximately $20.8 million on the type of communications that the Commission considers to be federal campaign activity" and that this sum "represent[ed] approximately 53 percent of the $39.1 million Crossroads GPS reported spending during 2010.  Therefore, Crossroads GPS's spending by itself shows that the group's major purpose during 2010 was federal campaign activities (*i.e.*, the nomination or election of a federal candidate)."  *Id.* at 26-27.

      44.     The General Counsel's Office then concluded: "Although we believe there is sufficient information at this stage to recommend pre-probable cause conciliation based solely on Crossroads GPS's spending for advertisements, . . . an investigation of Crossroads GPS's additional 2010 activity, including examination of its fundraising solicitations and advocacy mailings, may furnish evidence of additional spending on federal campaign activity that will

enhance the public record and establish definitively the date by which Crossroads GPS should

have registered as a political committee." *Id.* at 27.

### The Commission's Dismissal of Plaintiffs' Administrative Complaint

45.     Despite the Office of the General Counsel's strongly worded recommendation to

the Commission to investigate Crossroads GPS, on December 3, 2013, the Commission "failed

by a vote of 3-3 to . . . [f]ind reason to believe" that Crossroads GPS violated 2 U.S.C. §§ 432,

433 and 434 and subsequently closed the file, dismissing Plaintiffs' administrative complaint.

FEC, *In Re Crossroads Grassroots Policy Strategies* (MUR 6396), Certification, Dec. 5, 2013.

46.     By letter dated December 12, 2013, the FEC advised Plaintiff Kevin Zeese that

the Commission had an "insufficient number of votes" to find reason to believe that Crossroads

GPS violated the political committee provisions of FECA.  Letter from William Powers, Ass't

General Counsel, FEC, to Kevin Zeese, Dec. 12, 2013.  The Commission sent a similar letter of

notification to Plaintiff Craig Holman on December 23, 2013.  Letter from William Powers,

Ass't General Counsel, FEC, to Craig Holman, Dec. 23, 2013.

47.     On January 8, 2014, the FEC released the Statement of Reasons ("SOR") of the

Commissioners who voted against finding "reason to believe," and who effectively blocked the

Commission's investigation of Crossroads GPS and forced the dismissal of Plaintiffs'

administrative complaint.  FEC, Statement of Reasons of Chairman Lee E. Goodman and

Commissioners Caroline C. Hunter and Matthew S. Petersen (MUR 6396), Jan. 8, 2014

("Goodman, Hunter, Petersen SOR").

48.     On January 10, 2014, the FEC released the SOR of the Commissioners who voted

to find "reason to believe" that Crossroads GPS had violated FECA and to authorize further

investigation of the matter.  FEC, Statement of Reasons of Vice Chair Ann M. Ravel,

Commissioner Steven T. Walther, and Commissioner Ellen L. Weintraub (MUR 6396), Jan. 10, 2014 ("Ravel, Walther, Weintraub SOR").

49.     The Commissioners who voted to find "reason to believe" and to authorize further investigation believed this matter "gave rise to a clear-cut case for further investigation by the Commission, as recommended by our Office of General Counsel" and that "[t]he Commission ha[d] unfortunately failed to adhere to its own policy on political committee status or to recent judicial decisions finding that policy to be valid and constitutional."  Ravel, Walther, Weintraub SOR at 1.  They noted that Crossroads GPS's "spending on campaign activity is vast, both in absolute terms and as a proportion of its total spending."  *Id.* at 4.  They further agreed with the Office of General Counsel's legal analysis that: (1) the major purpose test's focus on "federal campaign activity" is not limited solely to express advocacy or its functional equivalent; (2) an organization can have the major purpose of federal campaign activity even if its spending on federal campaign activity is not a majority of the organization's total spending; and (3) spending should be analyzed according to a calendar year, rather than an organization's self-selected fiscal year.  *Id.* at 4.  Thus, these commissioners agreed with the OGC's recommendation to launch an investigation into Crossroads GPS's activities.

50.     The Commissioners whose votes blocked investigation of Crossroads GPS concluded in their SOR that Crossroads GPS did not have the requisite major purpose.  *See* Goodman, Hunter, Petersen SOR at 1.  The SOR disregarded the Commission's prior guidance, including its 2007 SE&J, and its prior advisory opinions.  The SOR further mischaracterized and misconstrued prior court decisions.  The Goodman, Hunter, Petersen SOR was based on a number of erroneous and impermissible interpretations of the law, including:

(a)     Only an organization's spending on express advocacy (and possibly its functional equivalent) could be considered in relation to its non-campaign related spending to determine a group's major purpose, *see* Goodman, Hunter, Petersen SOR at 14;

(b)     A group's spending on express advocacy must exceed 50% of the organization's budget to support a finding that the group's major purpose is the nomination or election of a candidate, *see id.* at 25;

(c)     A group's spending must be evaluated according to time periods utilized by the group, rather than according to a calendar year, *id.* at 20-21; and

(d)     A group's official statements in its articles of incorporation or mission statement and a group's self-claimed tax status are virtually dispositive in determining an organization's "central" purpose, *id.* at 10-13.

51.     Based on these and other incorrect interpretations and applications of the law governing political committees, the Goodman, Hunter, Petersen SOR—which forced dismissal of Plaintiffs' administrative complaint—wrongly concluded that there was insufficient evidence to find "reason to believe" that Crossroads GPS was a political committee under FECA and should have registered as such.  The Commission's dismissal of the complaint thus rested on manifest errors of law, absent which there would have been no non-arbitrary basis for the Commission's action.

## CAUSE OF ACTION

52.     The Commission's failure to find "reason to believe" that Crossroads GPS violated FECA and its subsequent dismissal of Plaintiffs' administrative complaint, which rested on the impermissible interpretation of FECA set forth in the Goodman, Hunter, Petersen SOR,

was arbitrary, capricious, an abuse of discretion and otherwise contrary to law.  *See* 2 U.S.C. §

437g(a)(8)(C); 5 U.S.C. § 706.

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs, by their undersigned counsel, respectfully request that the

Court grant the following relief:

a)      Declare that the Commission's decision to dismiss Plaintiffs'

administrative complaint was based on an impermissible interpretation of FECA, and was

arbitrary, capricious, an abuse of discretion, and otherwise contrary to law;

b)      Order the FEC to conform to such a declaration within 30 days, *see* 2

U.S.C. § 437g(a)(8)(C);

c)      Award legal fees and costs of suit incurred by Plaintiffs; and

d)      Grant such other and further relief as this Court deems just and proper.

Dated: January 31, 2014

Respectfully submitted,

/s/ J. Gerald Hebert
J. Gerald Hebert (DC Bar No. 447676)
Paul S. Ryan (DC Bar No. 502514)
CAMPAIGN LEGAL CENTER
215 E Street, NE
Washington, DC 20002
(202) 736-2200

Scott L. Nelson (DC Bar No. 413548)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Plaintiffs*