# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC CITIZEN, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:14-cv-00148 (RJL) |
| FEDERAL ELECTION COMMISSION, Defendant, | MEMORANDUM OF POINTS AND AUTHORITIES |
| CROSSROADS GRASSROOTS POLICY STRATEGIES, Intervenor-Defendant. | |

**CROSSROADS GRASSROOTS POLICY STRATEGIES' REPLY MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Michael E. Toner (D.C. Bar No: 439707)
Thomas W. Kirby (D.C. Bar No. 915231)
Stephen J. Kenny (D.C. Bar No. 1027711)
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
Tel.: 202.719.7000
Fax: 202.719.7049

Thomas J. Josefiak
J. Michael Bayes (D.C. Bar No. 501845)
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Tel.: 540.341.8808
Fax: 540.341.8809

*Counsel for Crossroads Grassroots Policy Strategies*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ..............................................................................................................1

ARGUMENT .....................................................................................................................3

I.   The Controlling Commissioners' Interpretations Are Entitled to *Chevron* Deference .......3

    A.   The application of the major-purpose test is an exercise in statutory interpretation entitled to *Chevron* deference...........................................................3

    B.   The controlling Commissioners' Statement of Reasons is entitled to *Chevron* deference in split-vote enforcement-action dismissals. ..........................................7

II.  The Dismissal Was Not Contrary to Law. ......................................................................10

    A.   It was reasonable for the controlling Commissioners to reject a rigid calendar-year approach. .......................................................................................11

    B.   The controlling Commissioners' spending analysis was not contrary to law........14

        1.   It was reasonable for the controlling Commissioners to limit their spending analysis to express advocacy and its functional equivalent........14

        2.   It was reasonable for the controlling Commissioners to reject Public Citizen's proposed standard..................................................................20

    C.   The Commission's conclusion that Crossroads GPS's central organizational purpose is not federal electoral activity was not arbitrary and capricious............22

III. Article III Redressability is Lacking................................................................................23

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*AFL-CIO v. FEC*,
    333 F.3d 168 (D.C. Cir. 2003) ...................................................................................4

*Akins v. FEC*,
    101 F.3d 731 (D.C. Cir. 1996) ...................................................................................6

*Already, LLC v. Nike, Inc.*,
    133 S. Ct. 721 (2013) .................................................................................................24

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ............................................................................................. *passim*

*Buckley v. Valeo*,
    519 F.2d 821 (D.C. Cir. 1975) (en banc), ................................................................15

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ....................................................................................................3

*Christensen v. Harris County*,
    529 U.S. 576 (2000) ....................................................................................................8

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ..................................................................................................15

*City of Arlington, Texas v. FCC*,
    133 S. Ct. 1863 (2013) ................................................................................................7

*Clark v. Martinez*,
    543 U.S. 371 (2005) ....................................................................................................3

*Coburn v. McHugh*,
    679 F.3d 924 (D.C. Cir. 2012) .................................................................................18

*Combat Veterans for Cong. Political Action Committee. v. FEC*,
    795 F.3d 151 (D.C. Cir. 2015) ...................................................................................9

*Consolidated Edison Co. of New York, Inc. v. FERC.*,
    347 F.3d 964 (D.C. Cir. 2003) .................................................................................18

*Davis v. FEC*,
    554 U.S. 724 (2008) ..................................................................................................15

*DeFunis v. Odegaard*,
    416 U.S. 312 (1974) (per curiam) ............................................................................24

*Democratic Senatorial Campaign Committee v. FEC*,
  745 F. Supp. 742 (D.D.C. 1990) ........................................................................18

*Dickinson v. Zurko*,
  527 U.S. 150 (1999) .........................................................................................23

*Durning v. Citibank, N.A.*,
  950 F.2d 1419 (9th Cir. 1991) ...........................................................................6

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building
  & Construction Trades Council*,
  485 U.S. 568 (1988) ...........................................................................................6

*FCC v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012) .....................................................................................20

*FEC v. Akins*,
  524 U.S. 11 (1998) ........................................................................................6, 25

*FEC v. Christian Coalition*,
  965 F. Supp. 66 (D.D.C. 1997) ........................................................................24

*FEC v. GOPAC*,
  917 F. Supp. 851 (D.D.C. 1996) ......................................................................17

*FEC v. Massachusetts Citizens for Life, Inc.*,
  479 U.S. 238 (1986) ..........................................................................................15

*FEC v. National Rifle Ass'n of America*,
  254 F.3d 173 (D.C. Cir. 2001) ...........................................................................6

*FEC v. Williams*,
  104 F.3d 237 (9th Cir. 1996) ............................................................................24

*FEC v. Wisconsin Right to Life, Inc*,
  551 U.S. 449 (2007) ..........................................................................................16

*Florida Right to Life, Inc. v. Mortham*,
  No. 98-770CIVORL19A, 1999 WL 33204523 (M.D. Fla. Dec. 15, 1999) ...........16

*Fogo De Chao (Holdings) Inc. v. Department of Homeland Security*,
  769 F.3d 1127 (D.C. Cir. 2014) .......................................................................10

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000) ..........................................................................................24

*Gold Reserve Inc. v. Bolivarian Republic of Venezuela*,
  No. CV 14-2014 (JEB), 2015 WL 7428532 (D.D.C. Nov. 20, 2015) ..................18

*Independent Community Bankers of America v. Board of*
   *Governors of Federal Reserve System,*
   195 F.3d 28 (D.C. Cir. 1999) ...................................................................10

*INS v. Aguirre-Aguirre,*
   526 U.S. 415 (1999) .................................................................................7

*Martin v. OSHRC,*
   499 U.S. 144 (1991) .................................................................................9

*McCleskey v. Kemp,*
   481 U.S. 279 (1987) .................................................................................9

*McConnell v. FEC,*
   540 U.S. 93 (2003) ...............................................................3, 16, 21, 22

*National Cable & Telecommunications Ass'n v. Brand X Internet Services,*
   545 U.S. 967 (2005) .................................................................................4

*National Institute of Military Justice v. United States Department of Defense,*
   512 F.3d 677 (D.C. Cir. 2008) ..................................................................8

*N.L.R.B. v. Catholic Bishop of Chicago,*
   440 U.S. 490 (1979) .................................................................................5

*N.M. Youth Organized v. Herrera,*
   611 F.3d 669 (10th Cir. 2010) ...............................................................16

*Negusie v. Holder,*
   555 U.S. 511 (2009) .................................................................................6

*O'Connor v. Donaldson,*
   422 U.S. 563 (1975) .................................................................................6

*Orloski v. FEC,*
   795 F.2d 156 (D.C. Cir. 1986) ...................................................... *passim*

*Pipefitters Local Union No. 562 v. United States,*
   407 U.S. 385 (1972) .................................................................................6

*Precon Development Corp. v. United States Army Corps of Engineers,*
   633 F.3d 278 (4th Cir. 2011) ....................................................................4

*Real Truth About Abortion, Inc. v. FEC,*
   681 F.3d 544 (4th Cir. 2012) ....................................................................4

*In re Sealed Case,*
   223 F.3d 775 (D.C. Cir. 2000) ....................................................7, 8, 9, 10

*Shays v. FEC*,
    511 F. Supp. 2d 19 (D.D.C. 2007) ........................................................................4

*Sloan v. United States Department of Housing and Urban Development*,
    236 F.3d 756 (D.C. Cir. 2006) ...........................................................................9

*United States v. Mead*,
    533 U.S. 218 (2001) ...........................................................................7, 8, 9, 10

*United States v. Midwest Generation, LLC*,
    720 F.3d 644 (7th Cir. 2013) ............................................................................24

*United States v. United States Steel Corp.*,
    16 F. Supp. 3d 944 (N.D. Ind. 2014) ...............................................................24

*United Steel, Paper & Forestry, Rubber, Manufacturing, Energy,*
    *Allied Industrial & Service Workers International Union, AFL-CIO-CLC v.*
    *Pension Benefit Guaranty Corp.*,
    707 F.3d 319 (D.C. Cir. 2013) ..........................................................................22

*University of Great Falls v. N.L.R.B.*,
    278 F.3d 1335 (D.C. Cir. 2002) .......................................................................5, 6

*Van Hollen v. FEC*,
    811 F.3d 486 (D.C. Cir. 2016) .........................................................................5, 6

*Vermont Right to Life Committee, Inc. v. Sorrell*,
    758 F.3d 118 (2d Cir. 2014) ..............................................................................17

*Wisconsin Right To Life, Inc. v. Barland*,
    751 F.3d 804 (7th Cir. 2014) ...............................................................15, 16, 21

## Statutes

52 U.S.C. § 30109 ...........................................................................................10, 25

## Regulations

66 Fed Reg. 13,681 (proposed Mar. 7, 2001) ..................................................20

72 Fed. Reg. 5,595 (Feb. 7, 2007) ....................................................................15

## Other Authorities

13C Charles Alan Wright & Arthur R. Miller,
    *Federal Practice and Procedure* § 3533.3 (3d ed.) .........................................24

Brad Smith, *What does it mean when the Federal Election Commission "Deadlocks"*,
Center for Competitive Politics (Apr. 14, 2009)................................................................9

FEC, Office of General Counsel, *Enforcement Manual* (June 2013) ....................................13, 18

Frances R. Hill & Douglas M. Mancino, *Taxation of Exempt Organizations* ¶ 36.03[4][a].........19

IRS, *Instructions for Form 990; Return of Organization Exempt From Income Tax –
Additional Material; Glossary*........................................................................................19

First General Counsel's Report, MUR 4940 (Dec. 19, 2000) ......................................................21

Raymond Chick and Amy Henchey, *Political Organizations
and IRC 501(c)(4)* (1995)................................................................................................19

## INTRODUCTION

The Federal Election Commission ("FEC" or "Commission") dismissed a complaint filed by Public Citizen against Crossroads Grassroots Policy Strategies ("Crossroads GPS") for allegedly failing to register and report as a political committee.  The controlling bloc of Commissioners ("controlling Commissioners") correctly determined that Crossroads GPS's major purpose was not federal election activity.  As explained in Crossroads GPS's cross-motion for summary judgment (Dkt. #60) (hereinafter "Cross-Motion"), the Commission lawfully dismissed the complaint on two grounds, either of which is sufficient to uphold the dismissal: First, the major-purpose test does not require a calendar-year time frame; and, second, the major-purpose test does not require issue advertisements that merely "oppose" or "criticize" the policy positions of public officials running for reelection to be equated with express electoral advocacy.

It is important to note the number of points that Public Citizen fails to rebut in its most recent reply brief (Dkt. #62) (hereinafter "Reply"):

- For Public Citizen to prevail, it must establish that the Commission was <u>required</u> to <u>both</u> (1) limit its time frame of analysis to a single calendar year <u>and</u> (2) reach far beyond express advocacy and also consider spending for true issue advertisements that could be interpreted as critical of a candidate as evidence of electoral purpose.

- Of all Crossroads GPS spending considered by the FEC (June 2010 to December 2011), less than 25% was for express advocacy.  Even if analysis were limited to the latter half of 2010, as Public Citizen urges, less than 40% of its spending was for express advocacy.

- The only way the Commission could have found that Crossroads GPS reached the 50% spending threshold was to <u>both</u> limit the major-purpose analysis to the second half of 2010 <u>and</u> treat issue advertisements that arguably, according to Public Citizen, criticize or

oppose federal officeholder candidates as evidence of Crossroads GPS's alleged electoral purpose.  Even under this artificially conceived scenario, only 53% of Crossroads GPS's spending would be viewed as federal election activity.

- No statute or judicial decision requires that the major-purpose test be assessed on a calendar-year basis.

- No statute or judicial decision requires that the major-purpose test include spending for communications that do not contain express advocacy, much less explains how such non-express advocacy spending must be weighed.

- The FEC has not once this century authorized an enforcement action where, as here, five years have elapsed since the alleged conduct.

The controlling Commissioners were right to reject a rigid and myopic calendar-year time frame for conducting the major-purpose test.  They reasonably concluded that limiting the major-purpose inquiry to only seven months of Crossroads GPS's activities during its first year of existence, when a more extensive record was before the FEC, presented a distorted picture of the organization's major purpose and was not compelled by statute or any other authority.

The controlling Commissioners also had a rational basis for including only spending for express advocacy and its functional equivalent in the major-purpose analysis.  This standard is supported by judicial precedent and provides clarity and guidance to speakers to know when their speech might trigger the onerous, ongoing registration and reporting requirements that apply to federal political committees.  An alternative standard—advocated by Public Citizen—is wildly over-inclusive and raises serious vagueness questions.  Public Citizen's standard would require inclusion of communications that merely "criticize" or are "highly negative" about the policy and legislative positions of federal officeholders who also happen to be candidates up for

re-election, *even if the communications are made more than a year before the relevant officeholders' re-elections*.  Not only does this standard fail to provide clear guidance to speakers, it would inevitably impose burdensome political committee obligations on entities whose major purpose is to engage in issue-based speech.  Under the deferential "contrary to law" standard of review, it was not irrational for the controlling Commissioners to adopt a clearer and more speech-protective standard that has been upheld by the courts.

## ARGUMENT

**I.    The Controlling Commissioners' Interpretations Are Entitled to *Chevron*[1] Deference.**

Public Citizen argues that the FEC's dismissal is not entitled to *Chevron* deference because (a) the major-purpose test derives from judicial precedent—specifically *Buckley v. Valeo*, 424 U.S. 1 (1976)—and not from the specific language of FECA, and (b) circuit precedent that requires the controlling Commissioners' decision to receive *Chevron* deference can supposedly be distinguished.  Reply at 2-3.  Neither argument is correct.

**A.    The application of the major-purpose test is an exercise in statutory interpretation entitled to *Chevron* deference.**

The major-purpose test has its roots in a narrowing construction of the Federal Election Campaign Act of 1971, as amended ("FECA"), adopted by the Supreme Court in *Buckley* to avoid questions of constitutionality, *see* 424 U.S. at 79, and is primarily an exercise in statutory interpretation.  The Court has emphasized this point with respect to the "express advocacy" construction it imposed at the same time.  *See McConnell v. FEC*, 540 U.S. 93, 191-92 (2003).  Construing statutes to avoid questions of constitutionality—known as the canon of avoidance— requires a court to "choos[e] between competing plausible interpretations of a statutory text." *Clark v. Martinez*, 543 U.S. 371, 381 (2005).  In so doing, the court adopts a particular

---

[1]     *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

interpretation of the statute.  But an agency is entitled to deference on a subsequent interpretation

of the same statute, even if that interpretation is different from a federal court's.  *Nat'l Cable &*

*Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).  "Only a judicial

precedent holding that the statute unambiguously forecloses the agency's interpretation . . .

displaces a conflicting agency construction."  *Id.* at 982-83.  When a court adopts a narrowing

construction to avoid constitutional questions, there is, by definition, a range of permissible

interpretations of the statute for which an agency may be entitled to deference.

When judicial precedent has "engrafted" an extra-textual test onto "statutory

requirements," *Chevron* deference is available for an agency's subsequent interpretation and

application of that test.  *Precon Dev. Corp. v. U.S. Army Corps of Eng'rs*, 633 F.3d 278, 289-90

& n.10 (4th Cir. 2011) (holding that *Chevron* deference would apply to an agency's formal

interpretation of the judicially created "significant nexus" test under the Clean Water Act).  This

is a sensible approach because a prior judicial construction of a statute does not disturb the

agency's role as the primary interpreter and enforcer of that statute.  *See Brand X*, 545 U.S. at

982-83.  This is all the more true with respect to the major-purpose test, which has been applied

by the FEC on a case-by-case basis for forty years—a practice to which Congress has

acquiesced—and is not simply an interpretation of *Buckley*.  Indeed, all parties agree that

*Buckley* "did not mandate a particular methodology for determining an organization's major

purpose," *Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 556 (4th Cir. 2012); *Shays v.*

*FEC*, 511 F. Supp. 2d 19, 29 (D.D.C. 2007) ("*Buckley* established the major purpose test, but did

not describe its application in any fashion.").

"Unique among federal administrative agencies, the [FEC] has as its sole purpose the

regulation of core constitutionally protected activity."  *AFL-CIO v. FEC*, 333 F.3d 168, 170

(D.C. Cir. 2003).  Consistent with this mandate, the Commission must be sensitive to the implications its actions have on core protected speech.  This, of course, requires the FEC to regularly consider judicial opinions that bear on First Amendment principles.  But that consideration does not deprive the FEC of deference to which it is otherwise entitled.  The D.C. Circuit recently held that the Commission is entitled to deference when it exercises "its unique prerogative to safeguard the First Amendment when implementing its congressional directives." *Van Hollen v. FEC*, 811 F.3d 486, 501 (D.C. Cir. 2016), *petition for reh'g filed* (Mar. 4, 2016). Because the FEC must, by virtue of its unique mandate, consider the First Amendment consequences of its actions, Public Citizen's proposed rule would have the effect of denying the FEC deference in nearly all of its adjudicatory actions.

There are, of course, limits to an agency's subsequent interpretation of a statute that a court previously construed to avoid constitutional questions.  An agency may not construe a statute to raise the precise constitutional questions the court sought to avoid in its initial interpretation.  A case cited by Public Citizen illustrates this point.  In *University of Great Falls v. N.L.R.B.*, 278 F.3d 1335 (D.C. Cir. 2002), the National Labor Relations Board ("NLRB") asserted that it had jurisdiction over a Catholic university.  The Supreme Court, however, had previously applied the canon of avoidance to preclude such jurisdiction, holding that it would raise serious constitutional questions.  *See N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979).  But the NLRB, purporting to apply the holding of *Catholic Bishop*, concluded that the university did not have a "substantial religious character" and therefore assumed jurisdiction over it.  278 F.3d at 1340.  This approach "not only create[d] the same constitutional concerns that led to the Supreme Court's decision in *Catholic Bishop*, it [was] so similar in principle to the approach rejected in *Catholic Bishop*" that the court had no choice but to invalidate it.  *Id.* at

1341.  Because "the constitutional avoidance canon of statutory interpretation trumps *Chevron* deference," the court did not defer to the NLRB.  *Id.* at 1340-41.

The court's concern in *University of Great Falls* is not, however, implicated in this case. The FEC did not apply the major-purpose test to Crossroads GPS in such a way as to raise First Amendment concerns.  The holding of *University of Great Falls* is simply that the canon of avoidance precludes deference to an agency interpretation that raises serious constitutional questions.  This is black-letter administrative law.  *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 574-75 (1988).  The D.C. Circuit did not suggest that agency interpretations of statutes are deprived of the deference to which they are otherwise entitled simply because the agency also considered judicial precedent.  *See FEC v. Nat'l Rifle Ass'n*, 254 F.3d 173, 182, 187 (D.C. Cir. 2001) (deferring to FEC interpretation based in part on Supreme Court's decision in *Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385 (1972)).  This is all the more true when judicial opinions are relied upon to support an interpretation that *avoids* serious constitutional questions.  *See Van Hollen*, 811 F.3d at 501.[2]

Because the FEC's application of the major-purpose test in this case is based on an interpretation of FECA, the Commission's decision is entitled to *Chevron* deference.[3]  The most

---

[2]      Public Citizen relies chiefly on two additional cases, neither of which supports its argument.  In *Negusie v. Holder*, 555 U.S. 511 (2009), the Supreme Court declined to defer to an agency's interpretation of judicial precedent construing a *different* statute than the one the agency was interpreting in the instant case.  *See id.* at 522 (The agency's "mistaken assumption stems from a failure to recognize the inapplicability of the principle of statutory construction invoked in *Fedorenko*, as well as a failure to appreciate the differences in statutory purpose.").  The other case, *Akins v. FEC*, 101 F.3d 731 (D.C. Cir. 1996), was vacated by the Supreme Court.  *See FEC v. Akins*, 524 U.S. 11, 29 (1998).  Vacatur of a judgment of the Court of Appeals "deprives that court's opinion of precedential effect."  *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975); *see also Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("A decision may be reversed on other grounds, but a decision that has been vacated has no precedential authority whatsoever.").  Although *Akins* has been cited subsequently for the general proposition that agencies are not typically entitled to deference when interpreting judicial opinions, it has not been cited for the specific proposition that the major-purpose test is one such exercise.

[3]      Public Citizen concedes that relevant judicial precedent is silent as to the temporal scope of the major-purpose test and contends that its preferred calendar-year time frame is compelled by the "plain statutory language."

that can be said for Public Citizen's argument is that deference is not appropriate in cases where an agency interpretation raises serious constitutional questions.  This is not such a case.

> **B.     The controlling Commissioners' Statement of Reasons is entitled to *Chevron* deference in split-vote enforcement-action dismissals.**

Public Citizen's argument that *Chevron* deference is not owed to a controlling Statement of Reasons in a split-vote dismissal of an FEC enforcement action contradicts binding circuit precedent.  As explained in Crossroads GPS's cross-motion for summary judgment, the D.C. Circuit squarely held in *In re Sealed Case*, 223 F.3d 775 (D.C. Cir. 2000), that a court owes *Chevron* deference to controlling FEC Commissioners' legal conclusions in split-vote dismissals of administrative complaints.  The court explained that, because FEC enforcement decisions are "part of a detailed statutory framework" that is "analogous to formal adjudication" where "the agency 'gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication,'" *Chevron* deference is owed to the controlling bloc of Commissioners.  *Id.* at 780 (quoting *INS v. Aguirre–Aguirre*, 526 U.S. 415, 425 (1999)).  Because the *process* by which an agency makes an interpretation determines whether *Chevron* deference is available, *see United States v. Mead Corp.*, 533 U.S. 218, 229-31 (2001), an interpretation made through the FEC's formal adjudication process is entitled to *Chevron* deference.  Interpretations made through formal processes, such as formal adjudication or notice-and-comment rulemaking, are essentially *per se* entitled to deference.  *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013) (remarking that there has not been "a single case in which a general conferral of rulemaking or adjudicative authority has been held insufficient to support *Chevron* deference for an exercise of that authority within the agency's substantive field").

---

Reply at 12.  Crossroads GPS disagrees with this statutory interpretation, but, at the very least, the controlling Commissioners' interpretation of FECA on this point is entitled to *Chevron* deference.

Public Citizen asserts that the Supreme Court's decision in *Mead* would have led to a different result in *Sealed Case*. Public Citizen contends that *Mead*'s holding—that only interpretations carrying the force and effect of law may receive *Chevron* deference—was not considered in *Sealed Case*. But this is incorrect; the court in *Sealed Case* quoted Supreme Court precedent standing for that exact proposition. *See* 223 F.3d at 780 ("'Interpretations . . . which *lack the force of law* []do not warrant *Chevron*-style deference.'" (emphasis in original) (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 586 (2000)). In *Christensen*, the Court held that an interpretation contained in an opinion letter was not entitled to the same level of deference as an interpretation "arrived at after . . . formal adjudication," which would have carried the force and effect of law.[4]  It is disingenuous for Public Citizen to claim that this is not the essential holding of *Mead*. There is simply no material distinction among *Sealed Case*, *Christensen*, and *Mead*, let alone an "eviscerat[ion]" of *Sealed Case* or *Christensen* by *Mead*. *Nat'l Inst. of Military Justice v. U.S. Dep't of Defense*, 512 F.3d 677, 682 n.7 (D.C. Cir. 2008). To the contrary, binding precedent in this circuit holds that the legal conclusions of controlling Commissioners in 3-3 dismissals of enforcement actions are entitled to *Chevron* deference.

Finally, Public Citizen argues that the FEC's uncontroversial statement that FECA requires four Commissioners to take certain  affirmative action—such as promulgate a regulation or issue an advisory opinion—means that a split-vote dismissal of an administrative complaint is not entitled to *Chevron* deference. Reply at 9. This argument conflates two distinct issues:  (1) whether three Commissioners can promulgate a regulation or issue an advisory opinion and (2) whether three Commissioners can issue a decision <u>with the force and effect of law in a particular enforcement action</u>, specifically by voting to dismiss an administrative complaint. Only the

---

[4]      Public Citizen cites to Justice Scalia's dissent in *Mead* but fails to note that he refused to join Part III of the Court's decision in *Christensen* for the same reason he dissented in *Mead*. *See Christensen*, 529 U.S. at 587, 589-91 (Scalia, J., concurring in part and concurring in the judgment).

latter is at issue here, and binding circuit precedent requires that such a decision by the controlling Commissioners be given *Chevron* deference.

Public Citizen's argument fails to account for the unique structure of the FEC and its enforcement process, and it is simply untrue that the votes of the controlling Commissioners in this matter "lack the force of law."  Congress designed the enforcement process to require the votes of four FEC Commissioners to ensure at least some bipartisan consensus among the Commissioners before the Commission may proceed on a complaint, as well as "to assure that enforcement actions . . . will be the product of a mature and considered judgment" and "reduce the risk that the Commission will abuse its powers."  *Combat Veterans for Cong. Political Action Comm. v. FEC*, 795 F.3d 151, 153 (D.C. Cir. 2015).  Under this congressional architecture, "[i]f the FEC votes 3-3 not to find a violation, that means the FEC has determined that the conduct does not violate the law."  Brad Smith, *What does it mean when the Federal Election Commission "Deadlocks"*, Center for Competitive Politics (Apr. 14, 2009).[5]  In other words, when the Commission votes 3-3 in an enforcement matter, this is not a deadlock without effect. Rather, it is a vote to dismiss a complaint because the Commission lacks the statutorily required four votes to find reason to believe a violation occurred.  This decision to dismiss carries <u>the force and effect of law</u> with respect to the particular case and is made through "a form expressly provided for by Congress."  *Sealed Case*, 223 F.3d at 780 (quoting *Martin v. OSHRC*, 499 U.S. 144, 157 (1991)).  Such a decision, the D.C. Circuit has held, is entitled to *Chevron* deference.[6]

---

[5]    http://www.campaignfreedom.org/2009/04/14/what-does-it-mean-when-the-federal-election-commission-deadlocks/.

[6]    Agency enforcement decisions are also, by nature, highly discretionary, *Sloan v. U.S. Dep't of Hous. & Urban Dev.*, 236 F.3d 756, 760 (D.C. Cir. 2006), and will be respected absent "exceptionally clear proof." *McCleskey v. Kemp*, 481 U.S. 279, 296 (1987).

The D.C. Circuit's recent decision in *Fogo De Chao (Holdings) Inc. v. Dep't of Homeland Sec.*, 769 F.3d 1127 (D.C. Cir. 2014) is consistent with this precedent.  As explained, *supra* at 7-8, the relevant test for determining whether an agency interpretation is entitled to *Chevron* deference is the process through which the agency acted.  *See Mead*, 533 U.S. at 230. In *Sealed Case*, the D.C. Circuit held that *Chevron* deference is required for a split-vote dismissal of an FEC enforcement action because the decision is made through formal adjudication.  223 F.3d at 780.  This is fully consistent with *Fogo de Chao*, where the court declined to defer to an agency's interpretation because it was "the product of underlined {informal} adjudication within the Service, rather than a formal adjudication or notice-and-comment rulemaking."  769 F.3d at 1136 (emphasis added).[7]

## II.     The Dismissal Was Not Contrary to Law.

In any event, the dismissal here was not "contrary to law."  *See* 52 U.S.C. § 30109(a)(8)(C).  An agency action is contrary to law if it is based on an impermissible interpretation of FECA or if it is "arbitrary or capricious, or an abuse of discretion."  *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986).  This standard is "extremely deferential" and "requires affirmance if a rational basis for the agency's decision is shown."  *Id.* at 167.  Public Citizen's objections to the dismissal of the administrative complaint against Crossroads GPS do not satisfy the high threshold required to overturn an agency decision as contrary to law.

The controlling Commissioners dismissed the complaint for two independent reasons, either of which is sufficient to uphold the dismissal on its own.  First, the controlling Commissioners concluded that a calendar year is not the exclusive or required time frame for a

---

[7]     To the extent that any aspect of *Fogo de Chao* is inconsistent with the holding of *Sealed Case*, the holding of *Sealed Case* controls.  *See Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) ("In the event of conflicting panel opinions . . . the earlier one controls, as one panel of this court may not overrule another." (citation omitted)).

major-purpose analysis.  Second, the controlling Commissioners limited the relevant spending

under the major-purpose test to express advocacy and its functional equivalent.  Only if this

Court holds that the Commission lacked a "rational basis" for <u>both</u> conclusions can this Court

find the dismissal was contrary to law.  *Orloski*, 795 F.2d at 167.

> **A.     It was reasonable for the controlling Commissioners to reject a rigid calendar-year approach.**

As an initial matter, Public Citizen is incorrect in framing the issue as between a

calendar-year standard and a fiscal-year time frame.  Contrary to Public Citizen's assertions, the

controlling Commissioners did not "insist[] on an . . . examination only of the organization's

self-selected fiscal year."  Reply at 18.  Instead, they explained, "We do not believe that fiscal

year is the required time frame in all [major purpose] analyses any more than we believe

calendar year is.  Rather, the facts in the case before us will determine the appropriate time frame

for analysis."  AR423 n.101.  Here, the controlling Commissioners considered all of Crossroads

GPS's spending that was in the record (*i.e.*, June 1, 2010 through December 31, 2011), which

covered Crossroads GPS's first two fiscal years, and concluded that "Crossroads GPS devoted

only 25 percent of its spending to relevant expenditures" during this time period.  AR423.  The

controlling Commissioners also explained that the use of other time frames—including a fiscal

year and calendar year—did not alter this conclusion.  *Id.*  In this particular context, the

controlling Commissioners rejected the calendar-year approach in favor of considering a wider

range of activities (twelve months or more instead of seven) that offered a fuller picture of how

Crossroads GPS "managed its affairs and programs."  *Id.*

The controlling Commissioners had good reason to reject a rigid calendar-year standard.

As Public Citizen concedes, "'*Buckley* and its progeny' have never compelled any particular time

frame for the analysis of major purpose" and said nothing about "any temporal requirement to

the 'major purpose' limitation." Reply at 12.  And nothing in the text, structure, or purposes of FECA suggests that the FEC must assess an organization's major purpose solely calendar-year-by-calendar-year.  *See* Cross-Motion at 20-22.

The controlling Commissioners, moreover, adequately explained the shortcomings of a myopic calendar-year approach.[8]  Depending on the circumstances, a calendar-year approach can produce a distorted picture of an organization and not accurately capture its true major purpose. AR420.  For example, a group that is founded in the middle of an election year may spend primarily on express advocacy in its first few months, yet subsequent spending reveals that this was a minor focus of the group.  This case exemplifies the reasonableness of the controlling Commissioners' approach.  In fact, it would have been *unreasonable* to review only seven months of Crossroads GPS's activities to assess its major purpose when a more comprehensive record was before the agency.  Puzzlingly, Public Citizen concedes this point, *see* Reply at 14 n.4 (noting it was "reasonabl[e]" for the FEC Office of General Counsel to "focus[] on the period for which Crossroads provided specific information"), yet maintains the Commission was required to ignore the information before it concerning Crossroads GPS's 2011 spending and focus solely on its 2010 spending.[9]

---

[8]     Public Citizen does not attempt to refute these points, choosing instead to tilt at the fiscal-year standard the controlling Commissioners specifically disclaimed as not being the required time frame.  And Public Citizen's contention that only those organizations that admit to having the major purpose of electoral advocacy would have to register under the standard enunciated by the controlling Commissioners, Reply at 14, is not accurate.  The FEC's political committee determinations have always been retrospective, and organizations must assess whether they are political committees based partly on what they believe they might end up spending.  If an organization concludes *ex ante* it is not a political committee, and its assessment turns out to be incorrect, then it may be liable *post hoc* for failing to register and report as a political committee.

[9]     Moreover, there are circumstances in which a fiscal-year time frame would cause an entity to have to register as a political committee whereas a calendar-year time frame would not.  An organization with a July 1–June 30 fiscal year, for example, might spend $20 million in the first six months of an election year on non-political activities.  In the next few months preceding the election, it spends $10 million on federal electoral activities.  Then, in the first six months of the following year, the organization spends $5 million on non-political activities.  Viewing this scenario through a fiscal-year lens, the organization would have the major purpose of federal election activity. However, under the calendar-year approach, the organization would not have this major purpose.

As Crossroads GPS catalogued in its cross-motion for summary judgment, *see* Cross-Mot. at 22-23, and Public Citizen does not dispute, the single-calendar-year time frame has never been the required approach under Commission or judicial precedent.  Indeed, such an approach was never even considered until this enforcement proceeding.  AR425.  Recognizing this history of contrary authority, Public Citizen concedes that the Commission and courts have found an election-cycle or even longer time frames to be the appropriate test in past enforcement cases. Reply at 16.  This concession demonstrates that a rigid calendar-year approach is not required by relevant authority and that time frames beyond a single calendar year are appropriate depending on the circumstances.[10]

Finally, the Commission was not required to consider spending after December 31, 2011. All parties agree that there must be start and end dates in a major-purpose analysis.  The controlling Commissioners reviewed 19 months of Crossroads GPS's activities—a time period that included an election cycle—and concluded that only 25% of its spending was for federal election purposes.  Of course, Public Citizen could have tried to amend its administrative complaint or supplement its submission with the FEC to include information from 2012 and 2013, *see* FEC, Office of General Counsel, *Enforcement Manual* at 34-35 (June 2013), but it did not do so.  Moreover, Public Citizen does not offer any evidence that indicates Crossroads GPS increased the percentage of its activities devoted to federal election activity after 2011.

---

[10]     To the extent that Public Citizen argues in the alternative that an election-cycle approach might be appropriate here—an argument it did not make before the Commission or in any previous filings with this Court—the same objections would apply.  Crossroads GPS was founded in June in the second year of an election cycle.  A review of a few months' worth of activities in isolation from the organization's broader pattern of activities would likewise present a distorted picture of the organization.  The controlling Commissioners were right to consider all of the spending in the administrative record.  As they explained, "[o]ften one can assess an organization's true major purpose only by reference to its entire history.  In other instances, shorter time frames, such as an election cycle, might suffice."  AR423 n.101.  But the facts and circumstances of each case will suggest which time frame is appropriate for a particular organization.

**B.** **The controlling Commissioners' spending analysis was not contrary to law.**

Public Citizen asserts that the standard articulated by the controlling Commissioners—that only spending for communications containing express advocacy or its functional equivalent count when determining an entity's major purpose—is contrary to law. Public Citizen also argues that its preferred standard—requiring inclusion of spending on communications that merely criticize or oppose the policy or legislative positions of federal officeholders running for reelection—is required by law. But the controlling Commissioners' reasoning is well-supported by the administrative record, and Public Citizen cannot meet its burden to show that this reasoning lacks a "rational basis." *Orloski*, 795 F.2d at 167.

**1.** **It was reasonable for the controlling Commissioners to limit their spending analysis to express advocacy and its functional equivalent.**

Public Citizen contends that the controlling Commissioners' spending analysis was irrational for three reasons. First, they argue that the controlling Commissioners should not have limited their analysis of the relevant spending to express advocacy and its functional equivalent. Second, the controlling Commissioners allegedly failed to consider whether certain advertisements were the functional equivalent of express advocacy. Third, the controlling Commissioners should have investigated the extent to which Crossroads GPS grant recipients used donations to fund their own political activities. These objections are meritless, and, under any standard of review, the controlling Commissioners' reasoning is not contrary to law.

**a.** The controlling Commissioners acted reasonably in drawing the line at express advocacy and its functional equivalent for purposes of the major-purpose test. At the outset, it should be noted that Crossroads GPS does not argue that spending on communications that do not contain express advocacy can never trigger disclosure requirements. Certain event-driven reporting requirements—such as requiring a report upon spending a specified amount on

electioneering communications, *see Citizens United v. FEC*, 558 U.S. 310, 368-69 (2010)—are narrowly tailored and "provide precisely the information necessary" to satisfy the government's interest in disclosure. *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986). But the issue in this case is which types of spending will subject an entity to onerous and ongoing reporting requirements as a federal political committee. Cases upholding one-time, event-driven reporting requirements have little bearing on disclosure regimes mandating ongoing reporting requirements. *See, e.g.*, *Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804, 824 (7th Cir. 2014) (A "one-time, event-driven disclosure rule is far less burdensome than the comprehensive registration and reporting system imposed on political committees." (discussing *Citizens United*, 558 U.S. at 368-69)). "[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Davis v. FEC*, 554 U.S. 724, 744 (2008) (quoting *Buckley*, 424 U.S. at 64). This is even truer when disclosure is compelled in perpetuity, as it is for federal political committees.

Courts have repeatedly cautioned that engaging in issue advocacy is not a basis for political committee status. The D.C. Circuit held that the political committee definition must be narrowly construed "since it potentially reaches . . . the activities of nonpartisan issue groups which [seek to] influenc[e] the public to demand of candidates that they take certain stands on the issues." *Buckley v. Valeo*, 519 F.2d 821, 863 n.112 (D.C. Cir. 1975) (en banc), *aff'd in part and rev'd in part*, 424 U.S. 1 (1976). The Supreme Court cited this language approvingly and confirmed that political committee status may not be stretched to apply to issue-oriented groups. *Buckley*, 424 U.S. at 79. The major-purpose test thus ensures that the FEC "avoid[s] the regulation of activity 'encompassing both issue discussion and advocacy of a political result.'" 72 Fed. Reg. 5,595, 5,597 (Feb. 7, 2007) (quoting *Buckley*, 424 U.S. at 79).

Public Citizen asserts that the express-advocacy test is "functionally meaningless" in distinguishing between issue advocacy and election-related speech.  Reply at 24 (quoting *McConnell*, 540 U.S. at 193).  But the Supreme Court's decision in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) stressed the continued vitality and relevance of an express-advocacy standard and articulated the criteria for determining when speech is the "functional equivalent" of express advocacy as opposed to genuine issue advocacy.  *Id.* at 469-70.  The Court emphasized that issue advocacy does not have an electoral purpose "simply because the issues may also be pertinent in an election."  *Id.* at 474.  An issue advertisement, therefore, does not become the "functional equivalent" of express advocacy merely because it mentions, criticizes, or asks citizens to contact a particular candidate.  *Id.* at 470-73.  Rather, the advertisement must be "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *Id.* at 469-70.  The controlling Commissioners' standard derives from and is grounded in this Supreme Court precedent.

Numerous federal court decisions support the controlling Commissioners' approach to limiting the major-purpose analysis to express advocacy and its functional equivalent.  *See, e.g.*, *Barland*, 751 F.3d at 841 (limiting application of political committee requirements to "groups that engage in express election advocacy as their major purpose"); *N.M. Youth Organized v. Herrera*, 611 F.3d 669, 678 (10th Cir. 2010) (evaluating whether a "group spends a preponderance of its expenditures on express advocacy" and including only "expenditures on express advocacy or contributions to candidates" in the major-purpose inquiry); *Fla. Right to Life, Inc. v. Mortham*, No. 98-770CIVORL19A, 1999 WL 33204523, at *4 (M.D. Fla. Dec. 15, 1999) (restricting political committee status "to organizations whose major purpose is engaging in 'express advocacy'" as defined in *Buckley*), *aff'd in relevant part on appeal sub. nom.*, *Fla.*

*Right to Life, Inc. v. Lamar*, 238 F.3d 1288 (11th Cir. 2001); *FEC v. GOPAC*, 917 F. Supp. 851, 863-64 (D.D.C. 1996) (declining to consider a letter that did "not advocate [the candidate's] election or defeat" as evidence that a group's major purpose was the election of candidates). Plainly, the controlling Commissioners' standard cannot be "arbitrary and capricious" when so many federal courts have adopted the same approach over many years.

Public Citizen cites several cases upholding state laws that allow non-express advocacy spending to trigger a regulated status. But these cases are of limited relevance, because states often do not impose the same burdensome registration and reporting requirements on political committees as FECA does. *See, e.g.*, *Vermont Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 138 (2d Cir. 2014) (noting that political committee status resets every two years in Vermont, in contrast to FECA's perpetual reporting obligations). Ultimately, however, this Court is not called upon to decide which approach to the major-purpose test is best, but whether the controlling Commissioners' approach has a "rational basis." *Orloski*, 795 F.2d at 167. That numerous federal courts have restricted the major-purpose analysis to the "core area" of express candidate advocacy, *Buckley*, 424 U.S. at 79, underscores the reasonableness of the controlling Commissioners' approach.

**b.**      Public Citizen contends that the controlling Commissioners did not determine whether $5.4 million in spending on communications criticizing or opposing federal candidates constitute the functional equivalent of express advocacy, Reply at 25, but is mistaken. *See* AR415 n.69 ("[The Office of General Counsel] does not argue, nor could it, that these additional communications were the functional equivalent of express advocacy." (emphasis added)).

**c.**      Finally, Public Citizen claims the controlling Commissioners were required to investigate whether recipients used Crossroads GPS grants to finance federal electoral activities.

But this argument has been waived in several respects, starting with Public Citizen's failure to include this argument in its administrative complaint filed with the FEC.  *See Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012) ("[I]ssues not raised before an agency are waived and will not be considered by a court on review." (citation omitted)).  Indeed, Public Citizen's administrative complaint is devoid of any mention of Crossroads GPS's grants, AR1-22, and Public Citizen had three years to supplement or amend its initial complaint if it wanted to raise the issue in the enforcement action before the FEC, *see Enforcement Manual* at 34-35. Crossroads GPS submitted its IRS Form 990s to the FEC nineteen months before the Commission voted to dismiss the enforcement action.  *See* AR239.  Public Citizen failed to preserve the issue in this litigation.[11]

Even if this argument was not waived, Public Citizen, in demanding the FEC investigate this issue at the reason to believe stage, ignores that the FEC may conduct an investigation only *after* it makes a reason to believe finding based on the record before the Commission.  *See Democratic Senatorial Campaign Comm. v. FEC*, 745 F. Supp. 742, 745-46 (D.D.C. 1990).  And a reason to believe finding requires a complainant to meet "a minimum evidentiary threshold," providing "at least some legally significant facts to distinguish the circumstances from every other" situation where a person engages in permissible conduct.  *Id.* (internal quotation marks and citation omitted).  "[T]he alleged facts must present something that is, in the broad sense, 'incriminating' and not satisfactorily answered by the respondents."  *Id.* at 746 (citation omitted). The record before the Commission in this case indicated only that Crossroads GPS made grants

---

[11]     Public Citizen devoted only two sentences to this issue in a footnote in its motion for summary judgment. *See* Mot. at 27 n.6 (Dkt. # 23).  But "[a]rguments made in a perfunctory manner, such as in a footnote, are waived." *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, No. CV 14-2014 (JEB), 2015 WL 7428532, at *9 (D.D.C. Nov. 20, 2015) (citation omitted).  Additionally, Public Citizen's argument is waived because it did not develop the argument until its reply briefs.  *See Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 970 (D.C. Cir. 2003) ("This argument is twice waived: NYISO never presented it to FERC, and although NYISO hints at the argument in its opening brief here, it failed to develop it fully until its reply brief." (citations omitted)).

to other social welfare organizations and that Crossroads GPS made these grants with the condition that the funds be spent on activities consistent with each recipient organization's Section 501(c)(4) exempt purpose.  These facts alone do not suggest any violation of the Act or support an FEC investigation into these grants.  Without some "legally significant facts" in the record—*e.g.*, evidence that the grants were earmarked for electoral purposes—there was no reason to believe that these grants may have constituted federal election activity.

In fact, none of Crossroads GPS's grants were made for electoral purposes.  As catalogued in Crossroads GPS's Protest Letter to the IRS, "every grant that GPS has made since its inception was subject to an explicit agreement between GPS and the grantee that the grant funds would be used only for social welfare purposes."  Crossroads GPS Revised Protest Letter at 37 (Feb. 28, 2014); *see also id.* at 131-32 (Statement of Steven J. Law, President of Crossroads GPS, Regarding Crossroads GPS's Grants).[12]  And, contrary to Public Citizen's erroneous assertions, *see* Reply at 26, "[n]o other restriction or oversight is required for GPS's grants to be properly classified as social welfare activity," and a grantor is not liable for the grantee's breach of an agreement.  Protest Letter at 38 (citing Frances R. Hill & Douglas M. Mancino, *Taxation of Exempt Organizations* ¶ 36.03[4][a]).  That some recipient organizations may have also engaged in political activities using other sources of funding is ultimately irrelevant.  The IRS recognized Crossroads GPS as a 501(c)(4) social welfare organization, which provides even further indication that Crossroads GPS's major purpose is not the election or defeat of federal candidates.[13]  *See* Ex. B (Crossroads GPS IRS Determination Letter).

---

[12]        The relevant portions of the Revised Protest Letter are attached as Exhibit A.

[13]        A 501(c)(4) organization "may engage in political campaign activities if those activities are not the organization's primary activity."  Raymond Chick and Amy Henchey, *Political Organizations and IRC 501(c)(4)* (1995), https://www.irs.gov/pub/irs-tege/eotopicm95.pdf.  The IRS defines "political campaign activities" much more broadly than the FEC to include "[a]ll activities that support or oppose candidates for elective federal, state, or local public office."  IRS, *Instructions for Form 990; Return of Organization Exempt From Income Tax - Additional*

**2. It was reasonable for the controlling Commissioners to reject Public Citizen's proposed standard.**

Public Citizen offers a variety of defenses of its own proposed standard—that all advertisements that promote, attack, support, oppose, criticize, or are "highly negative" about the policy or legislative positions of public officeholders who are also federal candidates must count towards triggering political committee status. Public Citizen Mot. for Summ. J. at 7, 8, 26 (Dkt. #23). Public Citizen again ignores that the relevant question is not which standard this Court believes is the most preferable, but whether the standard actually adopted by the controlling Commissioners has a "rational basis." *Orloski*, 795 F.2d at 167. The controlling Commissioners rightly rejected a "promote-attack-support-oppose-criticize" standard proposed by the FEC Office of General Counsel, because such a standard raises serious vagueness concerns and potentially chills protected speech. "[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.*

Public Citizen's inability to meaningfully distinguish between the two advertisements cited in Crossroads GPS's motion for summary judgment, Reply at 31, is a telling indictment of its proposed standard. The most Public Citizen can muster is that the advertisements "concerned different subject matters, referenced different candidates and ran at different times during different elections." *Id.* That the advertisements concerned different subject matters and candidates is immaterial. The fact that the advertisements ran within a few weeks of each other in their respective election cycles—yet the FEC Office of General Counsel came to opposite

---

*Material; Glossary*, available at  https://www.irs.gov/pub/irs-pdf/i990.pdf; *see also Definition of Political Committee*, 66 Fed. Reg. 13,681, 13,687 (proposed Mar. 7, 2001) (explaining that the IRS's definition of a "political organization" is "substantially broader than the FECA definition of a 'political committee'").

conclusions about their proximity to the election—underscores the lack of "precision and guidance" inherent in this standard.[14]  Indeed, under the standard advocated by Public Citizen, there is *no* temporal limit on when advertisements criticizing public officials will trigger political committee status.  *See* AR365 (considering 2011 spending—more than a year before the election—indicative of an entity's major purpose); *see also* Public Citizen Reply Mem. & Mem. in Opp'n to FEC's Mot. for Summ. J. at 21 n.6 (Dkt. #38) (advocating inclusion of 2011 communications as potentially "electorally motivated").  The controlling Commissioners were right and certainly not required to accept this vague and boundless standard.

Public Citizen cites a series of cases upholding the constitutionality of "promote-attack-support-oppose" and similar standards at the state level.  But, as explained *supra* at 17, states typically have less burdensome organizational and reporting obligations associated with political committee status than does FECA.  "The greater the burden on the regulated class, the more acute the need for clarity and precision."  *Barland*, 751 F.3d at 837.  With respect to FECA, the Court in *Buckley* held that terms like "relative to" and "'advocating the election or defeat of' a candidate" do not give "fair warning" to speakers.  *Buckley*, 424 U.S. at 41-42 & n.48.  More recently, the Seventh Circuit held that a similar standard under Wisconsin law was unconstitutionally vague.  *See Barland*, 751 F.3d at 837-38.[15]  And, ultimately, the cases cited by Public Citizen do not render it irrational for the controlling Commissioners to opt for a standard

---

[14]     Public Citizen also tries to distinguish the First General Counsel's Report in MUR 4940 by noting that it preceded the 2007 Supplemental E&J (by about six years).  Reply at 31.  This is, again, a distinction without a difference, because the FEC Office of General Counsel purported to apply a standard similar to the one advocated by Public Citizen.  *See* MUR 4940, First General Counsel's Report at 25 (Dec. 19, 2000) ("[N]either ad calls on the public to support or oppose the election of any federal candidate.").  That the same standard can be applied to similarly situated speakers and produce vastly different conclusions by regulators demonstrates the standard's obvious vagueness problems.

[15]     The court further explained that the "promote-attack-support-oppose" standard upheld in *McConnell* was not vague with respect to political party committees but that the calculus changes when "ordinary citizens, grass-roots issue-advocacy groups, and § 501(c)(4) social-welfare organizations are exposed to civil and criminal penalties for failing to register and report as a PAC."  *Id.* at 838.  This is in contrast to "potential party speakers" whose actions "are presumed to be in connection with election campaigns."  *McConnell*, 540 U.S. at 170 n.64.

that provides more clarity to regulated persons and poses fewer vagueness issues than Public Citizen's preferred standard.

Finally, Public Citizen again tries to argue that past agency enforcement actions reveal a "policy" of considering non-express advocacy speech in the major-purpose analysis. Reply at 32. But, as Crossroads GPS explained—and Public Citizen does not dispute—there was no occasion for the FEC in those enforcement actions to parse the precise types of spending that count in the major-purpose test. *See* Cross-Mot. at 39. Most of the enforcement actions cited in the First General Counsel's Report, AR356, involved 527 organizations, which are "organized for the express purpose of engaging in partisan political activity." *McConnell*, 540 U.S. at 174 n.67. These organizations' self-declared central organizational purpose was electoral activity for purposes of applying the major-purpose test. And, as Crossroads GPS noted, in the sole enforcement action involving a Section 501(c)(4) organization, the respondent conceded that the major-purpose test was satisfied. *See* Cross-Motion at 39 n.12.

**C.**   **The Commission's conclusion that Crossroads GPS's central organizational purpose is not federal electoral activity was not arbitrary and capricious.**

Without even addressing the extremely deferential "arbitrary and capricious" standard that applies to an agency's weighing of record evidence, Public Citizen asks this court to re-weigh the Commission's treatment of eighteen news articles that neither the FEC Office of General Counsel, the controlling Commissioners, nor the dissenting Commissioners placed any weight on. As explained in Crossroads GPS's cross-motion, it "is not the court's function" to reweigh the record evidence before the agency. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. Pension Benefit Guar. Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013). Rather, courts must affirm an agency decision if a

"'reasonable mind might accept' a particular evidentiary record as 'adequate to support a conclusion.'" *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (citation omitted).

Public Citizen's argument amounts to nothing more than that the controlling Commissioners should have placed more evidentiary weight on eighteen news articles. But the Commissioners explained why these articles were unreliable and of minimal value, AR411-12, credited Crossroads GPS's explanation of each article in the record, AR228-236, and weighed what it considered to be more probative evidence, AR410-11. And the FEC Office of General Counsel—whose "approach to the major-purpose analysis" Public Citizen "supports," Reply at 28 n.15—did not even suggest that Crossroads GPS has the central organizational purpose of federal election activity. AR355-66. Nor did the dissenting Commissioners. AR505-09.

Public Citizen also highlights a stray quotation from an article that Crossroads GPS submitted as part of its application for recognition of tax-exempt status with the IRS. Leaving aside that this quotation does not suggest any impropriety—Crossroads GPS may coordinate with non-candidate groups when structuring its political activities—the IRS reviewed this document and nonetheless recognized that Crossroads GPS is a 501(c)(4) social welfare organization. By definition, a social welfare organization may not have political campaign activities as its primary purpose. *See supra* at 19. The IRS's recognition of Crossroads GPS's status as a 501(c)(4) organization further demonstrates that it was not arbitrary and capricious for the Commission to reach the same conclusion: that Crossroads GPS does not have the central organizational purpose of federal election activity.

## III.    Article III Redressability is Lacking.

Unable to demonstrate any plausible path to redress now that the limitations period has run, Public Citizen argues instead that post-complaint developments present questions of "mootness" under which Article III jurisdiction supposedly persists unless redress has become

absolutely "impossible."  Reply at 41.  In fact, cases like the present one, where a court cannot directly grant redress, often present a "blend of standing and mootness" that defy easy formulas. 13C Wright & Miller, *Federal Practice and Procedure* § 3533.3 (3d ed.).

Moreover, words like "impossible" must often be taken with some salt.  Where redressability comes into question as time passes during litigation, the Supreme Court dismisses if there is "no reasonable expectation" of remedy.  *DeFunis v. Odegaard*, 416 U.S. 312, 318 (1974) (per curiam).  Even where a defendant argues that its own voluntary acts eliminate an Article III controversy—circumstances inviting abuse and calling for the greatest judicial skepticism—jurisdiction fails if it is clear a need for remedy "could not reasonably be expected to recur."  *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

Under any standard short of mere hopeful speculation, redressability fails here.  Public Citizen does not deny that any judgment Public Citizen might obtain would leave the FEC free to dismiss again on grounds of staleness.  Public Citizen hypothesizes legal theories on which the FEC theoretically could attempt enforcement after the limitations period expired.  But its only purported example of such a case comes from the last century, *FEC v. Christian Coalition*, 965 F. Supp. 66, 68 (D.D.C. 1997), an action the FEC authorized before the Ninth Circuit's decision in *FEC v. Williams*, 104 F.3d 237 (9th Cir. 1996).[16]  Public Citizen's reliance on one outdated example tacitly confirms that the FEC's current practice is to dismiss stale claims.[17]

---

[16]    The FEC authorized the *Christian Coalition* enforcement action on May 7, 1996.  *See* 965 F. Supp. at 68. The Ninth Circuit decided *Williams* on December 26, 1996.

[17]    Public Citizen is mistaken in its reading of *United States v. Midwest Generation, LLC*, 720 F.3d 644 (7th Cir. 2013).  The court did find that 28 U.S.C. § 2462 barred injunctive relief.  *See United States v. U.S. Steel Corp.*, 16 F. Supp. 3d 944, 950 (N.D. Ind. 2014) ("[I]t is evident that the Seventh Circuit has applied a five-year limitations period to the EPA's suit for injunction." (discussing *Midwest Generation*)).

Tellingly, Public Citizen points to no authority that an appeal from a dismissal of an FEC complaint tolls the statute of limitations.  Moreover, although Public Citizen says it might be able to overcome the limitations defenses if it brought a private enforcement action against Crossroads GPS, Public Citizen has no authority to bring such a lawsuit unless the FEC fails to comply with a judgment in this action.  *See* 52 U.S.C. § 30109(a)(8)(C).  And Public Citizen does not even claim, much less attempt to show, that the FEC could not lawfully follow its current practice of dismissing stale claims following any judgment here.  *See FEC v. Akins*, 524 U.S. 11, 25 (1998) (dismissal on new grounds is lawful).  Thus, whether Public Citizen might be able to overcome the statute of limitations is immaterial.[18]

This is an unusual case in which any Article III controversy was marginal from the outset.  The statute under which Public Citizen has sued does not authorize direct redress for Public Citizen's claimed injury.  Instead, the most Public Citizen can obtain here is a judgment that the FEC's dismissal was invalid.  That judgment can lead to redress only if the FEC then decides to pursue an enforcement action.  The FEC's current practice is to dismiss stale complaints, and Public Citizen has no reasonable expectation the Commission will deviate from that practice here.  Article III jurisdiction therefore fails.

## CONCLUSION

This Court should grant Crossroads GPS's cross-motion for summary judgment and deny Public Citizen's motion for summary judgment.

---

[18]     The scattershot arguments offered by Public Citizen are tempting targets.  For example, it is implausible that, by obtaining a stay from the Court of Appeals to avert irreparable injury pending successful vindication of its legal right to intervene, Crossroads GPS gave up its limitations defense.  Likewise implausible is the notion that Public Citizen's lawsuit against the FEC, to which Crossroads GPS was not even a party, constitutes an enforcement action against Crossroads GPS.  *Compare* 52 U.S.C. § 30109(a)(6) (the FEC may institute an enforcement action against a respondent) *with* § 30109(a)(8) (a complainant may appeal the dismissal of a complaint by suing the FEC).

Respectfully submitted,

/s/ Thomas W. Kirby

Thomas J. Josefiak

J. Michael Bayes (D.C. Bar No. 501845)

HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC

45 North Hill Drive, Suite 100

Warrenton, VA 20186

Tel.: 540.341.8808

Fax: 540.341.8809

Michael E. Toner (D.C. Bar No: 439707)

Thomas W. Kirby (D.C. Bar No. 915231)

Stephen J. Kenny (D.C. Bar No. 1027711)

WILEY REIN LLP

1776 K Street NW

Washington, DC 20006

Tel.: 202.719.7000

Fax: 202.719.7049

April 7, 2016

*Counsel for Crossroads Grassroots Policy Strategies*